**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALLCO FINANCE LIMITED,<br><br>        Plaintiff,<br><br>  v.<br><br>ROBERT KLEE, in his Official Capacity as Commissioner of the CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION, and ARTHUR HOUSE,<br>JOHN W. BETKOSKI, III and MICHAEL CARON, in their Official Capacities as Commissioners of the CONNECTICUT PUBLIC UTILITIES REGULATORY AUTHORITY,<br><br>        Defendants | **Civil Action Nos.**<br>3:15-cv-608 (CSH)<br>and 3:16-cv-508 (CSH)<br>(related cases with identical parties)<br><br><br>**AUGUST 18, 2016** |

**OMNIBUS RULING IN RELATED CASES ON MOTIONS TO DISMISS COMPLAINTS
AND FOR PRELIMINARY INJUNCTIVE RELIEF**

**HAIGHT, Senior District Judge:**

This ruling concerns two cases, each entitled *Allco v. Klee, et al.*, which bear docket numbers 3:15-cv-608 and 3:16-cv-508. These two cases, related but not formally consolidated, center on the State of Connecticut's implementation of a 2013 state statute that empowered the Commissioner of Connecticut's Department of Energy and Environmental Protection to solicit proposals for renewable energy, select winners of the solicitation, and direct Connecticut's utilities to enter into wholesale energy contracts with the chosen winners. Additionally, 3:15-cv-608 also concerns a statute which requires energy utilities to buy renewable energy credits or produce renewable energy themselves in order to sell energy in the State of Connecticut.

Plaintiff Allco Finance Limited ("Allco"), a generator of renewable electrical energy, has filed two actions in this Court against Connecticut State industry regulators. Plaintiff Allco contends in each action that the state statutory scheme is precluded by or violates federal energy statutes, and that Connecticut's

1

implementation of its statute has damaged plaintiff. In each action, the same Defendants, who are the Connecticut State regulators, move to dismiss the complaint. Plaintiff opposes Defendants' motions to dismiss, and for its part, moves for preliminary injunctive relief in each case, which Defendants oppose.

In consequence, these two cases, viewed together, currently present for the Court's consideration two motions to dismiss and two motions for preliminary injunctive relief. The parties and the issues are largely the same. The motions have been elaborately briefed by able counsel. The Court heard oral argument. This Omnibus Ruling decides all four motions.

I.

A.

The discovery of fire was a significant event, creating for mankind warmth against the cold and light in the darkness. We do not know which man or woman first noticed that a burning bundle of sticks produced those useful results of warmth and light, which in modern times are the products of alternative forms of energy. Electrical energy is one of these. The concept of electricity was first deduced by William Gilbert, a physician in the service of Elizabeth I of England (1533–1603). In 1752, Benjamin Franklin demonstrated the practical application of electricity by flying a kite carrying a key into a lightening storm. Today, electricity is a principal source of light and heat for the world and its people.

As the importance of electricity has increased exponentially in human affairs, politicians and governments inevitably stepped up regulation of the generation and marketing of electrical energy. In the United States, responsibility for the electrical energy industry is divided between the federal Congress and the state legislatures. "In the early 20th century, state and local agencies oversaw nearly all generation, transmission, and distribution of electricity." *FERC v. Electric Power Supply Association*, 136 S. Ct. 760, 767 (2016) ("*EPSA*""). When, in 1927, the Supreme Court held that the Commerce Clause barred the States from regulating interstate aspects of electricity transactions, *see Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.,* 273 U.S. 83, 89–90 (1927), a void in the federal regulatory scheme was exposed, which

Congress filled in 1935 by enacting the Federal Power Act, 16 U.S.C. § 791a *et seq*. ("FPA" or "the Act"). The Act fashioned that federal–state division of legislative regulatory responsibility that underlies and gives rise to the cases at bar.

Created in 1973, the Federal Energy Regulatory Commission ("FERC") has exclusive authority to regulate "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). A wholesale sale is defined as a "sale of electric energy to any person for resale."  16 U.S.C. § 824(d).  "But the law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale' – most notably,  any retail sale – of electricity." *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1292 (2016) (*quoting EPSA*, 136 S.Ct. at 762). "The States' reserved authority includes control over in-state 'facilities used for the generation of electrical energy.'" *Id*. (*quoting* 16 U.S.C. § 824(b)).  "Alongside those grants of power, however, the Act also limits FERC's regulatory reach, and thereby maintains a zone of exclusive state jurisdiction. . . . Accordingly, the Commission may not regulate either  within-state  wholesale sales, or more important here, retail sales of electricity (*i.e.*, sales directly to users).  State utility commissions continue to oversee those transactions."  *EPSA*, 136 S.Ct. at 767–768 (*citation omitted*).

Under the FPA, FERC "has authority to regulate 'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *Id.* at 767 (*quoting* 16 U.S.C. § 824(b)(1)).  The FPA obligates FERC "to oversee all prices for those interstate transactions and all rules and practices affecting such prices," and further provides that "all rates and charges made, demanded or received by any public utility for or in connection with" interstate transmissions or wholesale sales must be "just and reasonable." *Id*. (*quoting* 16 U.S.C. § 824d(a))  If "any rate for charge," or "any rule, regulation, practice or contract affecting such rate [or] charge" falls short of that standard, FERC "must rectify the problem: It shall then determine what is 'just and reasonable' and impose 'the same by order.'" *Id*. (*quoting* 16 U.S.C. § 824e(a).

Furthermore, within the electricity market there are three general categories of actors: generators (or

other entities that buy energy through bilateral contracts), transmitters, and load serving entities (LSEs). *See Hughes v. Talen Energy Marketing, LLC*, 136 S.Ct. 1288, 1292 (Apr. 29, 2016). Generators include power plants and other sources of energy production. *Id.* LSEs distribute power to the end user. DIVISION OF ENERGY MARKET OVERSIGHT OFFICE OF ENFORCEMENT, FEDERAL ENERGY REGULATORY COMMISSION, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS, 57–63 (2015) (*available at* www.ferc.gov/market-oversidght/guide/enerty-primer.pdf). Transmitters historically were private entities, but currently are nonprofit "Regional Transmission Organizations" ("RTOs") or "Independent System Operators" ("ISOs"). *Id.* There are seven RTOs in the United States. *Id.* The New England ISO ("ISO-NE"), which is of interest in this case, operates in New England, including in Connecticut. *Id.*

In 1978, Congress enacted the Public Utility Regulatory Practices Act ("PURPA"). "Technically, PURPA is one of several amendments to the Federal Power Act," whose provisions are codified in part in the FPA, 16 U.S.C. § 824a-3. *See Allco Finance Limited v. Klee*, 805 F.3d 89, 91 n. 1 (2015) (hereinafter "*Allco II*"). Given that the Federal Power Act gives FERC "exclusive authority to regulate sales of electricity at wholesale in interstate commerce," *Allco II*, 805 F.3d at 91 (*citing* 16 U.S.C. § 824(b)(1)), "States may not act in this area unless Congress creates an exception." *Id*. (*citing* 16 U.S.C. § 824(b)). "PURPA contains one such exception that permits states to foster electric generation by certain power production facilities ('qualifying facilities') that have no more than 80 megawatts of capacity and use renewable generation technology." *Id.* at 91–92. That particular aspect of the statutory scheme plays a part in the cases at bar.

This engrafting of PURPA upon the FPA reflects the fact that FERC's role in ensuring that a public utility's rates or charges for electricity are just and reasonable has evolved over the years as the industry has changed. "Decades ago, state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas." *EPSA*, 136 S.Ct. at 768. Since the FPA's passage, electricity has increasingly become a competitive interstate business, in which independent power plants abound, and electricity flows "not through the local power networks of

the past, but instead through an interconnected 'grid' of near-nationwide scope." *Id.* (citation omitted).  In that new world, FERC

> often forgoes the cost-based rate-setting traditionally used to prevent monopolistic pricing.  The Commission instead undertakes to ensure "just and reasonable" wholesale rates by enhancing competition – attempting, as we recently explained, "to break down regulatory and economic barriers that hinder a free market in wholesale electricity."

136 S.Ct. at 768 (*quoting Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 536 (2008)).

There are two ways in which FERC achieves its regulatory aims. First, Generators and LSEs can enter private, bilateral contracts called "Power Purchase Agreements" (PPAs). *See Hughes*, 136 S.Ct. at 1292. If these bilateral contracts  are made in good faith and are the result of arms-length negotiation, then they are presumed reasonable by FERC. *Id*. (*citing Morgan Stanley*, 554 U.S. at 546–48). Second, RTOs can buy from and sell to generators and LSEs through a FERC-approved auction process. *Id.* RTOs transmit the energy sold by generators to LSEs, but also run several markets under the supervision of FERC, including a same-day auction, a next-day auction, and a capacity auction. DIVISION OF ENERGY MARKET OVERSIGHT OFFICE OF ENFORCEMENT, FEDERAL ENERGY REGULATORY COMMISSION, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS*, 57–63 (2015) (*available at* www.ferc.gov/market-oversidght/guide/enerty-primer.pdf). The"capacity auction" is designed to ensure enough generation is available to meet future power demands. *Id.* For ISO-NE, a is conducted by state regulators three years prior to when the capacity is needed. *Id.* The RTOs determine how much capacity will be needed in three years' time, then generators, and  utilities that have acquired capacity from generators under bilateral contracts, commit to sell (and the RTOs commit to purchase) the amount of capacity selected in the auction for resale to the LSE in three years' time. *Id.*

## B.

One mechanism FERC employs for that salutary purpose, the Court noted in *EPSA*, is to

> encourage[] the creation of nonprofit entities to manage wholesale markets

> on a regional basis.  Seven such wholesale market operators now serve areas with roughly two-thirds of the country's electricity load (an industry term for the amount of electricity used).  Each administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably.  And still more important for present purposes, each operator conducts a competitive auction to set wholesale prices for electricity.
>
> These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day.  Such a real-time mechanism is needed because, unlike most products, electricity cannot be stored effectively.

136 S.Ct. at 768.

The Supreme Court filed its opinion in *EPSA* on January 28, 2016 and filed *Hughes* almost three months later, on April 19, 2016.  *EPSA* upheld an FERC order which required wholesale electricity market operators to compensate electricity users, or demand response providers, at the same rate as electricity generators, for users' commitment to reduce their electricity use during peak periods.  *Hughes* rejected a state commission order directing state utilities to enter into a contract for differences with new power companies to incentivize the construction of the plant.  *Hughes* gives a detailed explanation of a competitive wholesale auction, of the sort to which *EPSA* referred more or less *en passant*.

The auction in *Hughes* was conducted by PJM Interconnection, a RTO that "oversees the electricity grid in all or parts of 13 mid-Atlantic and Midwestern States and the District of Columbia."  136 S.Ct. at 1293.  PJM, functioning as an RTO, predicted regional electricity demand three years ahead of time, and initiated a capacity auction to account for the demand.  Justice Ginsburg's opinion in *Hughes* describes what happened next:

> Owners of capacity to produce electricity in three years' time bid to sell that capacity to PJM [the RTO] at proposed rates.  PJM accepts bids until it has purchased enough capacity to satisfy anticipated demand. All accepted capacity sellers receive the highest accepted rate, called the "clearing price."  LSEs must purchase, from PJM, enough electricity to satisfy their assigned share of overall projected demand.

6

136 S.Ct. at 1293.  Justice Ginsburg said approvingly that a capacity auction "serves to identify need for the new generation," is "designed to accommodate long-term bilateral contracts for capacity," and "FERC extensively regulates the structure of the PJM capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price." *Id.* at 1293–1294.

Bilateral contracts, a separate and secondary feature of the market, are an integral part of the energy market. These contracts are subject to review by FERC. *See Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 US. 527 (2008) ("[T]he FPA also permits utilities to set rates with individual electricity through bilateral contracts. . . [which] must be filed with the Commission before they go into effect."). While generally these contracts are between private parties, at issue in this case is a Connecticut State program to solicit proposals for bilateral contracts with renewable energy generators. In *Allco II,* the Second Circuit said of Connecticut's pertinent statute that it "empowered the Commissioner of Connecticut's Department of Energy and Environmental Protection to solicit proposals for renewable energy, select winners of the solicitation, and direct Connecticut's utilities to enter into wholesale energy contracts with the chosen winners."  805 F.3d at 92.[1]

The cases at bar arise out of Allco's allegations that the State's implementation of the Connecticut statutory scheme violated provisions of the FPA and PURPA.

II.

A.

In 2013, Connecticut enacted Connecticut Public Act 13-303.  Section 6 of that Act empowers the Commissioner of the Connecticut Department of Energy and Environmental Protection ("DEEP") to solicit proposals for renewable energy and thereafter direct the Connecticut Power and Light Company and United Illuminating, the principal Connecticut utility companies,  to enter into wholesale power purchase agreements

---

[1]  At the hearing on the cases at bar, counsel for Connecticut Commissioner Klee played down his client's power over the rates that the utilities pay to power generators within the bilateral contracts. "In fact," counsel said, "at the auctions the power generators will offer their prices," and the State has contracts "outside of the auctions to hedge against what happens in the auctions," at the conclusion of which "we direct the utilities to sign.  The utilities, in fact, negotiate, and they don't always sign them. If they don't accept them, we cannot make them to [*sic*].  I have no power to drag them into court and make them sign these things." Oral Argument Tr. 36-37.

7

for a term of up to twenty years, serving up to four percent of Connecticut's electricity needs. Section 6 provides in pertinent part that the Commissioner "may . . . solicit proposals . . . from providers of Class 1 renewable energy sources" and "if the commissioner finds such proposals to be in the interest of ratepayers . . . [he or she] may select proposals from such resources to meet up to four per cent of the load distributed by the state's electric distribution companies." Conn. Public Act 13-303, Section 6.

In July 2013, the Commissioner solicited proposals from providers of renewable energy, pursuant to Section 6 ("the 2013 RFP"). Allco submitted proposals for five solar projects. The Commissioner did not select them. Instead, he selected a wind project located in Maine, Number Nine Wind, and a different solar project located in Connecticut , Fusion Solar, and directed the Connecticut utilities to execute power purchase agreements at fixed wholesale prices with the entities whose proposals had been selected.

Disappointed by this result, Allco reacted by suing the DEEP Commissioner. The complaint, filed on December 18, 2013, was given docket number 3:13-cv-1874 and assigned to District Judge Arterton. Allco charged that the Commissioner's implementation of Section 6 and attendant selection of energy providers violated federal law. Its theory of the case was that under the FPA, FERC had exclusive jurisdiction over wholesale energy prices; any exceptions to the rule prohibiting states from setting wholesale prices existed only in PURPA. Thus, the Commissioner's implementation of Section 6 by means of the 2013 RFP had the effect of fixing wholesale energy prices, a power reserved to FERC under the FPA; the resulting proposals would be permissible only if they complied with PURPA; and, Allco contends, they failed to do so.

In an opinion reported at 2014 WL 7004024 (D.Conn. Dec.10, 2014), Judge Arterton granted the Commissioner's motion to dismiss Allco's complaint ("*Allco I*"). She held that Allco lacked standing, and its claim also failed on the merits. *Id.* at *10. The Second Circuit affirmed the dismissal of Allco's complaint, on somewhat different grounds. *Allco Finance Ltd. v. Klee*,  805 F.3d 89 (2d Cir. 2015) ("*Allco II*"). Certiorari does not appear to have been sought.

The Second Circuit's decision in *Allco II* seemingly brought to an end litigation between Allco and the State Defendants arising out of the 2013 RFP.  However, under the circumstances described *infra*, Allco contends that its 2013 FRP claims  have been revived, they are risen, and Allco asserts them again in *Allco IV*, as a ground for equitable relief.

B.

The Second Circuit filed its opinion in *Allco II* on December 1, 2015.  On April 26, 2015, while that appeal was pending, Allco filed another complaint [docket number 3:15-cv-608] which was assigned to the undersigned.  I will refer to that case as "*Allco III*."  Allco is the Plaintiff.  The DEEP Commissioner and the individual Commissioners of the Connecticut Public Utilities Regulations Authority ("PURA") are the same Defendants as those in the earlier case before Judge Arterton, which I will call "the 2013 RFP case." Allco's complaint in *Allco III* alleges at § 29 that on February 26, 2015, DEEP issued a draft request for proposals under Section 6 of the Connecticut Public Act.  The State intends to proceed in the same manner as it did in connection with the 2013 RFP.  I will call this renewed aspect of the litigation "the 2015 RFP case."

The *Allco III* complaint further alleges that in the 2015 RFP case, DEEP plans to issue its final request for proposals "in the spring of 2015 and compel wholesale energy transactions soon after it completes its review of proposals."  *Allco III*, Complaint, ¶ 30. Allco's theory in *Allco III* with respect to the 2015 RFP is the same as it was in *Allco I* with respect to the 2013 RFP: The actions of the State DEEP, purportedly in accordance with Section 6 of the Connecticut statute, violate provisions of the pertinent federal statutes, the FPA and PURPA.  Allco also moves for a preliminary injunction in respect of the 2015 RFP.  At that time the *Allco III* complaint was filed, no claims by Allco were pending in respect of the 2013 RFP, because Judge Arterton had dismissed the complaint in *Allco I* and Allco's appeal to the Second Circuit was pending.  That landscape changed when on December 1, 2015, the Second Circuit decided *Allco II*, the appeal of *Allco I*. It is necessary to consider that opinion carefully.

8

III.

A.

In *Allco I*, which was assigned to Judge Arterton, Allco's claims and theories against the State Defendants with respect to the 2013 RFP mirror the claims and theories Allco pleads against the same Defendants in *Allco III* with respect to the 2015 RFP. Judge Arterton dismissed Allco's complaint in *Allco I*, in an opinion reported at 2014 WL 7004024 (D.Conn. Dec. 10, 2014). She held that Allco lacked standing in the case because it had not suffered a legally protected injury within the zone of interests protected by the Federal Power Act. Alternatively, Judge Arterton concluded that Allco's claim failed on the merits because the State Defendants' "implementation of Section 6 does not seek to regulate wholesale energy sales but rather is a permissible regulation of utilities under the State's jurisdiction." *Allco I*, 2014 WL 7004024, at *10.

Allco appealed the dismissal of *Allco I*. The Second Circuit affirmed that dismissal, albeit on what Chief Judge Katzmann's opinion characterized as "alternative grounds." *Allco II*, 805 F. 3d 89, 91 (2015) ("*Allco II*"). The Second Circuit held that (1) PURPA's private right of action foreclosed Allco's claims under 42 U.S.C. §§ 1983 and 1988 to vindicate any rights conferred by PURPA; "(2) Allco failed to exhaust its administrative remedies, a prerequisite for its equitable action seeking to vindicate specific rights conferred by PURPA; and (3) Allco lacks standing to bring a preemption action seeking solely to void the contracts awarded to" the successful 2013 RFP bidders. *Allco II*, 805 F.3d at 91.

The Second Circuit's opinion in *Allco II* and Judge Arterton's order of dismissal in *Allco I*, which *Alco II* affirmed, dealt solely with the 2013 RFP. *Allco III*, where the complaint was filed on April 26, 2015, and is pending before this Court, deals solely with the 2015 RFP. Allco has filed yet another, more recent case in this Court, which I will call "*Allco IV*." The complaint in *Allco IV* was filed on March 30, 2016. In *Allco IV*, Allco continues to attack the validity of the State's 2015 RFP through its motion for an order to

9

show cause as to why a preliminary injunction should not issue, but also revives its challenge to the 2013 RFP in the complaint.

As noted, the complaint in *Allco I* challenged the 2013 RFP, Judge Arterton dismissed that complaint, the Second Circuit affirmed the dismissal, and the Supreme Court was not asked to interfere. One would have thought that the *Allco I* controversy over the 2013 RFP was dead, but Allco purports to lift it up, like Lazarus, and makes that claim a part of its complaint in *Allco IV*. Allco's theory is that events subsequent to the Second Circuit's opinion in *Allco II* have cured Allco's failure to exhaust administrative remedies, one of the deficiencies noted by the Court of Appeals in *Allco II.*

B.

In the Second Circuit's opinion in *Allco II*, the Court of Appeals considered two of Allco's requested forms of relief that are relevant to this Court's analysis of the cases at bar. First, the Second Circuit dealt with Allco's request to enjoin the Commissioner from conducting future procurement that violated the Federal Power Act or PURPA. Allco's theory behind its preemption claim relied, as it does here, on PURPA. Allco claimed that "the only way in which the Commissioner can issue a Section 6 contract that is not preempted by the Federal Power Act is if that contract meets the requirements of the PURPA exception." *Allco II*, 805 F.3d. at 96. The Second Circuit held that Allco could not avoid the administrative exhaustion requirement of PURPA by "characterizing an otherwise covered PURPA-related equitable claim as a Supremacy Clause claim." *Id.* (*citing Niagara Mohawk Power Corp. v. FERC*, 306 F.3d 1264, 1270 (2d Cir. 2000)).

Second, the court analyzed Allco's request to void the Section 6 contracts already awarded to two power producers under the 2013 RFP. The court said "[t]o the extent that these claims seek only to invalidate the results of the prior procurement . . . Allco lacks standing because that requested relief does not redress its injury, *i.e.*, its not being selected for a Section 6 contract." *Allco II*, 805 F.3d. at 98. Furthermore, voiding the contracts awarded to the two power producers "fail[s] to redress Allco's injuries, as they do not make it

10

'likely, as opposed to merely speculative,' that Allco will eventually receive a Section 6 contract." *Id.* (*citing Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000)). This remedy, the court noted, "would simply deny Allco's competitors a contractual benefit without redressing Allco's injury—its not being selected for a Section 6 contract." *Allco II*, 805 F.3d. at 98.

Notwithstanding these adverse appellate rulings, Allco purports to find in the Second Circuit's *Allco II* opinion significant support for its cause. Allco acknowledges that the Second Circuit dismissed on standing grounds its request to void the Section 6 contracts awarded to two other power producers as the result of a prior RFP which had been fully executed and the contracts awarded at the end of process. Allco distinguishes that circumstance from its claim in the instant cases that the State Defendants are proposing to violate PURPA in connection with future RFP. As to that aspect of the case, Allco reads *Allco II* as holding only Allco that had not exhausted its administrative remedies with respect to future RFPs' compliance with PURPA. Allco interprets that particular holding as an implied decision by the Second Circuit that Allco has standing, as a qualifying facility under PURPA, to seek declaratory and injunctive relief against future contemplated or presently promulgated and outstanding RFPs, so long as Allco has exhausted the administrative remedies available to address the grievances complained of.

This argument has surface appeal, but it does not penetrate below the surface.  True enough, the Second Circuit dismissed this aspect of the case in *Allco II* on the basis that Allco had not exhausted its administrative remedies; but the Court of Appeals said nothing about whether Allco would acquire standing if it thereafter exhausted those administrative remedies.  The Second Circuit's opinion added that "[a]s Allco acknowledges, its 'status as a small power producer' under PURPA 'is relevant to [its] Article III standing and to explain[ing] why [its] injury is redressable.' [] As such, any equitable relief relating to future contracts awarded under Section 6 necessarily implicates PURPA; otherwise, such relief would provide no path by which Allco could eventually obtain a non-preempted Section 6 contract." *Allco II*, 805 F.3d at 96. The Second Circuit did make clear that Allco was not challenging the statute as a "disappointed bidder" but

instead is bringing its case to enforce PURPA.  *Id.*

C.

Further changes in the circumstances of the case have occurred since December 1, 2015, when the Second Circuit filed its amended opinion in *Allco II.*  Following the Court of Appeals' dismissal of its complaint. Allco petitioned FERC to initiate enforcement proceedings pursuant to PURPA against DEEP and PURA.  In a Notice of Intent Not To Act issued on January 8, 2016 [Doc. 33-1], FERC advised:

> Notice is hereby given that the Commission declines to initiate an enforcement action under section 210(h)(2) of PURPA.  Our decision not to initiate an enforcement action means that Allco may themselves bring an enforcement action against the Connecticut Commission and DEEP in the appropriate court.

Defendants submitted this Notice from FERC to the Court's attention as an attachment to "Defendants' Third Notice of Additional Authority" [Doc. 33] in *Allco III.*  That submission is in effect a mini-brief in which the Defendants undertake to explain the effect of FERC's declining to bring enforcement actions against DEEP and PURA upon Allco's right to bring the instant action.  Defendants' accompanying submission says of FERC's Notice of Intent Not to Act:

> The Notice demonstrates the statutory procedure plaintiff Allco failed to follow in an earlier lawsuit challenging a renewable energy procurement conducted by DEEP in 2013.  *See Allco Fin. Ltd. v. Klee*, 805 F.3d 89 (2d Cir. Nov. 6, 2015).  Allco's lawsuit arising out of the 2013 procurement was dismissed by the United States Court of Appeals for the Second circuit for failure to exhaust administrative remedies.  *Allco v. Klee*, 805 F.3d at 97. Specifically, Allco failed to follow 16 U.S.C. § 824a-3(h)(2)(B) which permits FERC the opportunity [*sic*] to either initiate enforcement against the state regulatory authority, or decline to do so, thereby enabling Allco to bring suit against the state regulatory authority in District court.  After dismissal by the Second Circuit Court of Appeals, Allco petitioned FERC to initiate enforcement proceedings against DEP and PURA.  In the attached Notice of Intent Not To Act, FERC declined to do so. Consequently, Allco may now bring action against the state regulatory authority regarding the 2013 procurement in District Court, providing all jurisdictional prerequisites are met.
>
> Count I of the instant case relates to a future procurement to be conducted by DEEP, and potential future action by PURA (providing

12

> DEEP finds projects acceptable under the terms of the RFP and an application is filed at PURA). The attached Notice demonstrates the statutory procedure Allco should have followed to bring the instant action, but failed to pursue.

Doc. 33 at 1–2.

The Notice, and the accompanying discussion intended to explain it, are not models of clarity. FERC's Notice of Intent Not to Act does not identify the target or subject matter of Allco's "petition for enforcement." As of January 8, 2016, the date FERC issued its Notice, two requests for proposals by the state regulatory authorities were subjects of concern: the 2013 RFP (which had been distributed to the industry and fully implemented) and the 2015 RFP (which was contemplated for the future). The State Defendants' quoted discussion appears to view Allco's petition for enforcement as relating solely to the 2013 RFP. I do not know how else to construe the Defendants' statement that as the result of FERC's issuing its Notice of Intent Not to Act, "Allco may now bring action [*sic*] against the state regulatory authority regarding the 2013 procurement in District Court, provided all jurisdictional prerequisites are met" (a qualifying phrase Defendants do not bother to define). As for the 2015 RFP, which is the subject matter of *Allco III*, Defendants say only that FERC's Notice "demonstrates the statutory procedure Allco should have followed to bring the instant action, but failed to pursue." I do not know how to construe *that* statement other than as an assertion by Defendants (or their counsel) that FERC Notice had nothing to do with the 2015 RFP.

It would seem that Thomas Melone, the CEO of Allco who is also admitted to the Connecticut Bar and appears as counsel of record for Allco, has a different view. On March 30, 2016, Allco filed its complaint in *Allco IV*, which asserts claims with respect to both RFP 2015 and RFP 2013. *Allco IV* echoes *Allco III*'s request for a preliminary injunction against the 2015 RFP. On April 27, 2016 the Court heard oral argument on Allco's motions for preliminary injunctive relief. During the hearing on the present motions, Mr. Melone was asked to comment on the Second Circuit's opinion in *Allco II*, and said this:

> [S]ince the Second Circuit went out of its way to say what we didn't have standing with regard to, they were saying that we had standing with respect

13

> to everything else once we went through the petition at FERC from a
> jurisdictional perspective, which we now have. . . . [W]hat the Second
> Circuit did say is that our case – we had to go to FERC first from a
> jurisdictional perspective because that – because we were trying to enforce
> PURPA, and trying to enforce the specific part of PURPA which says that
> a state has to implement the FERC's rules, and what the Second Circuit did
> say explicitly is that what thet meant was that the State couldn't act contrary
> to the Federal Power Act or PURPA.
>
> So that's why we're here today, because we went to the FERC, we are
> prosecuting this case based on an enforcement action under PURPA, which
> the Second Circuit said we had to do it that way, and that means, I think by
> definition, we have statutory standing, as well as a qualifying facility,
> regardless of whether we bid into the RFP.

Oral Argument Tr. 5-7.  This colloquy suggests that in Melone's view, when FERC responded to Allco's

petition for enforcement by issuing its Notice of No Intent To Act on January 8, 2016, the agency opened

the flood gates (so to speak) to any subsequent district court action Allco might be advised to bring, on either

RFP or both of them.

IV.

The Defendants' discussion of FERC's Notice of Intent not to Act, quoted *supra*, reflects their

agreement that Allco has exhausted the relevant administrative remedies with respect to the 2013 RFP.  That

discussion explicitly acknowledges that Allco may proceed with an action in this Court "against the state

regulatory authority regarding the 2013 procurement." Doc. 33. All parties agree that FERC's Notice of Intent

removes the exhaustion-of remedies obstacle to proceedings in the district court which the Second Circuit

identified in *Allco II*, which was concerned solely with the 2013 RFP.

Whether that earlier exchange between Allco and FERC, culminating in FERC's Notice of Intent,

also has the effect of exhausting Allco's administrative remedies with respect to the 2015 RFP (as Mr.

Melone proclaimed and Defendants seem to deny) presents a further question.  I conclude that FERC's Notice

of Intent Not to Act, issued on January 8, 2016, exhausted Allco's administrative remedies with respect to

the 2013 RFP *and* the 2015 RFP, so that RFP Allco is freed of that impediment to actions in this Court

14

complaining of Defendants' conduct on both occasions. I base that conclusion on the Petition for Enforcement Allco dated November 9, 2015, which Allco sent to FERC and FERC rejected in its responsive Notice of Intent. Allco's Petition charged the state agencies (DEEP and PURA) with "improper implementation of PURPA." Petition at 1.[2] The Petition describes two instances of this perceived misconduct. The first occurred when "in July 2013 the Commissioner solicited proposals for renewable energy sources pursuant to Section 6" and thereafter compelled Connecticut utilities "to enter into a contract with a generator," Allco's bid being among those that "were not selected." Petition at 4. The Petition then says: "Recently, the Commission has announced is intention to conduct another procurement under Sections 6 and 7," and goes on to complain about the "new solicitation" on the same grounds. *Id.* This is clearly a reference to the 2015 RFP. Allco ended its Petition with the request that FERC "take action to enforce PURPA against the Connecticut Agencies to invalidate and permanently enjoin the Connecticut Agencies' compulsion of wholesale sales with other than QFs." *Id.* at 6.

In that broadly worded demand, Allco was asking FERC to take remedial enforcement action with respect to both the 2013 RFP and the 2015 RFP. That is the only way to read the Petition. Its demand for relief is prefaced by separate references to and complaints about, first, the 2013 RFP (fully implemented) and second, the 2015 RFP (contemplated). FERC's Notice of Intent must be read to express its decision to decline enforcement with respect to both RFPs. It follows that Allco has exhausted its administrative remedies with respect to both RFPs.[3]

An additional point on this aspect of the cases must be made. Defendants accurately observe that

---

[2]  Unaccountably, counsel for the parties did not include Allco's Petition to FERC in their submissions on these motions. The document is accessible on FERC's website.

[3]  That is the position apparently embraced by Assistant Attorney General Hollander, who argued the case for the PURA Defendants during the April 27 hearing: "I went back and reviewed and saw that plaintiff had placed both the Section 7 and the 2015 act before FERC. And so we believe plaintiff has exhausted. But none of that changes the fact that we believe that the Court does not have jurisdiction over this matter because plaintiff lacks standing and plaintiff has failed to state a claim." Tr. 40.

FERC having declined to act on the 2013 RFP, "Allco may now bring action against the state regulatory authority regarding the 2013 procurement in District Court, *providing all jurisdictional prerequisites are met*." Doc. 33 at 2 (*emphasis added*).  For the reasons stated, Allco has the same ability to sue concerning the 2015 procurement as it does concerning the 2013 RFP, and for the same reason: the intervening exhaustion by Allco of its administrative remedies.  However, contrary to its professed impression, Allco's burden to satisfy "jurisdictional prerequisites" for its court actions is neither affected nor satisfied by FERC's declination of administrative enforcement.  It is perfectly clear that conceptually, a party may exhaust administrative remedies (as Allco has done), be disappointed by the result (as Allco surely is), and then find itself unable to establish subject matter jurisdiction to pursue its grievances in an Article III federal court.  Whether administrative remedies have been exhausted and federal subject matter jurisdiction exists are different questions.  Resolution of the exhaustion question in a plaintiff's favor does not *ipso facto* establish federal jurisdiction over its underlying claims.   Allco briefs and argues these cases on the apparent theory that, by exhausting the administrative remedy identified by the Second Circuit in *Allco II*, Allco has explicitly or implicitly satisfied all the standing to sue requirements imposed by Article III.  The Second Circuit made no such holding in *Allco II*, there no authority for that proposition, and I reject it.

In consequence, the Court must consider whether Allco's actions against the Connecticut regulatory authorities satisfy all the jurisdictional predicates for litigation on the merits in this Article III court.

V.

Up to this point, this Ruling describes the history of Allco's two basic claims against the Defendants: the first arising out of the 2013 RFP, and the second arising out of the 2015 RFP.  Allco's challenges to both RFPs were briefed together by counsel and argued together on April 27, 2016.  While decision was pending, the landscape of the cases changed once again.

On July 11, 2016, the parties filed in *Allco IV* a document with the somewhat misleading caption of

16

"First Joint Notice of Additional Authority" [Doc. 33].  This submission advises the Court that in a letter ruling issued on July 6 the Connecticut Public Utilities Authority "approved two motions that effectively terminate the Number Nine Wind Farm LLC power purchase agreement at issue in this proceeding."

"Number Nine" or "Number Nine Wind," as the company has come to be called in this litigation, was one of two companies to which the State DEEP Commissioner awarded power purchase agreements at the conclusion of the 2013 RFP procurement process.  Allco submitted a proposal in that process but was not selected by the Commissioner.  Allco's theory in the cases at bar has been and remains that Connecticut's state statute procurement process violates federal law.  That theory was first asserted in *Allco I* before Judge Arterton, a case confined to the 2013 RFP, in which Allco sued the present State Defendants, and Number Nine and the other successful bidder intervened to protect their interests.  In that case, to quote the Second Circuit, Allco "sought equitable relief in the form of voiding the intervenors' contracts and enjoining the Commissioner from violating the Federal Power Act and PURPA in any future Section 6 procurement process."  *Allco II*, 805 F.3d at 91.  I have recounted *supra* that Judge Arterton dismissed Allco's 2013 RFP action, the Second Circuit affirmed the dismissal on different grounds, Allco cured its failure to exhaust administrative remedies that the Second Circuit held to be a ground for dismissal, and then revived its 2013 RFP claim as a part of the complaint in *Allco IV*.[4]  In consequence, when counsel appeared at the April 27 hearing to argue both cases, Allco was pressing its initial claim that the power purchase agreement the Commissioner awarded to Number Nine was illegal and should be voided *ab initio*.

The joint submission of July 11 states that there was a power purchase agreement between Number Nine Wind and The Connecticut Light and Power Company, and another agreement between Number Nine Wind and United Illuminating Company, purchase agreements which "result from a procurement conducted

---

[4]  Allco contends that the Second Circuit's ruling on Allco's exhaustion of administrative remedies impliedly holds that there are no other obstacles to Allco's legal action, such as standing to sue. That contention is rejected in this Ruling.

in 2013 by the Department of Energy and Environment Protection." Doc. 33, pp. 2–3. Those parties to the

power purchase agreements, "moved to terminate the agreements because Number Nine Wind was unable

to meet certain milestones set forth in the agreements." *Id.* To state the case in forensic terms: While Allco's

request that the Court kill the Number Nine power purchase agreements as a matter of law was pending, the

Number Nine agreements died unexpectedly of unrelated natural causes.

> The effect of this development upon the litigation in this Court is described by the parties as follows:

>> The termination of the Number Nine Wind power purchase agreements renders moot plaintiff's request to declare those agreements void *ab initio*. With the termination of the agreements, no claims remain as to the 2013 procurement.

>> However, the remainder of plaintiff's claims are unaffected by the termination of the Number Nine Wind power purchase agreements, including the request to declare void *ab initio* any agreement that may result from the 2015 request for proposals process.

Doc. 33.

> The Court accepts counsel's joint representation that "no claims remain as to the 2013 procurement."

Accordingly, the balance of this discussion and the resulting Ruling have to do only with claims and issues

arising out of the 2015 procurement process initiated by the Defendants, of which the Plaintiff complains.[5]

VI.

A.

> The first jurisdictional predicate a trial judge must consider, in deciding whether a particular case

can proceed to the merits, is whether the plaintiff has standing to sue on its claims in a federal court.

Standing "is the threshold question in every federal case, determining the power of the court to entertain the

suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (*quoting Warth v. Seldin*, 422 U.S.

490, 498 (1975)).

---

[5] Given the broad wording of the most recent submission, and the tenor of the other briefs and arguments, the court infers that Allco is not presently asserting any claims with respect to Fusion Solar, the other winner (with Number Nine Wind) in the 2013 procurement process.

18

Throughout the litigation in the cases at bar, the State regulatory defendants have challenged Allco's standing to assert the several claims in suit.[6]  A recent expression of that challenge is found in Defendants' brief in support of their motion to dismiss Allco's complaint in *Allco IV*, a pleading that attacks the validity of Defendants' actions in connection with both the 2013 RFP and the 2015 RFP. Docs. 20, 20-1.  Defendants' Notice of Motion in that case states: "The plaintiff lacks standing.  Moreover, the plaintiff has failed to state a claim for which relief can be granted."  Defendants' brief describes Plaintiff's actions as, *inter alia*, seeking "a declaratory ruling that the two state energy procurement efforts are preempted by the Federal Power Act," as well as asserting other claims.  Defendants' briefs and arguments engage these claims on their merits.  Defendants begin with the dismissive contention that "this Court need not reach the merits of Plaintiff's claims because Plaintiff lacks standing to bring them." Doc. 20-1 at 2, 10.

The Supreme Court has had numerous occasions to consider, reflect upon and adjudicate a party's standing to sue in an Article III federal district court.  Its  most recent expressions appear in *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), decided on May 16. There, the Court vacated and remanded a Ninth Circuit decision which had held that an individual plaintiff, whose incorrect personal information was disseminated by the defendant search engine, had suffered a sufficient injury-in-fact to give him standing to sue the defendant in the district court.

Justice Alito's decision in *Spokeo* reiterates the overarching importance of the standing to sue doctrine upon the jurisdiction of a federal trial court to hear a case.  His analysis begins with the observation that under Article III, §§ 1 and 2 of the Constitution, the "judicial Power of the United States" "extends only to 'Cases' and 'Controversies.'" *Spokeo*, 136 S.Ct. at 1547.  Indeed, "no principle is more important to the

---

[6]  Even if Defendants had not questioned Allco's standing, the Court would be required to examine the issue *sua sponte*.  *Denney*, 443 F.3d at 263 n. 3 (where plaintiff's standing was not timely challenged in or decided by the district court, "We are nonetheless required to consider any standing issue, since it speaks to our jurisdiction over this action." ) (*citations omitted*).

judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id*. (*citation and internal quotation marks omitted*).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," whose purpose is "to ensure that federal courts do not exceed their authority as it has been traditionally understood," and by its operation "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 136 S.Ct. at 1547 (*citations omitted*). In these ways, "the law of Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches, and confines the federal courts to a properly judicial role." *Id*. (*citations and internal quotation marks omitted*). *Spokeo* sums up the present state of the standing to sue doctrine:

> Our cases have established that the irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage,

the plaintiff must clearly allege facts demonstrating each element.

136 S.Ct. at 1547 (*citations, internal quotation marks and ellipses omitted*).

### B.

The evaluation of a federal plaintiff's standing *vel non* typically begins with asking whether the plaintiff has suffered an *injury-in-fact*, "the first and foremost of standing's three elements." *Spokeo*, 136 S.Ct. at 1547 (citation and internal quotation marks omitted). Justice Alito's opinion continues: "To establish an injury-in-fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (*citation and internal quotation marks omitted*). *Spokeo* goes on to hold that the "particularization and concreteness requirements," are different:

20

>       For an injury to be "particularized," it must affect the plaintiff in a
> personal and individual way. . . . Particularzation is necessary to establish
> injury-in-fact, but it is not sufficient.   An injury-in-fact must also be
> "concrete." . . . . We have made it clear time and again that an injury-in-fact
> must be both concrete *and* particularized. . . . A "concrete" injury must be
> " *de facto*"; that is, it must actually exist.  When we have used the adjective
> "concrete," we have meant to convey the usual meaning of the term –
> "real," and not "abstract." . . . . "Concrete" is not, however, necessarily
> synonymous with "tangible."  Although tangible injuries are perhaps easier
> to recognize, we have confirmed in many of our previous cases that
> intangible injuries can nevertheless be concrete. . . .
>
>       Congress' role in identifying and elevating intangible harms does not
> mean that a plaintiff automatically satisfies the injury-in-fact requirement
> whenever a statute grants a person a statutory right and purports to
> authorize that person to sue to vindicate that right.  Article III standing
> requires a concrete injury even in the context of a statutory violation. . . .
> This does not mean, however, that the risk of real harm cannot satisfy the
> requirement of concreteness. . . . [T]he violation of a procedural right
> granted by statute can be sufficient in some circumstances to constitute
> injury-in-fact.  In other words, a plaintiff in such a case need not allege any
> *additional* harm beyond the one Congress has identified. . . .
>
>       Because the Ninth Circuit failed to fully appreciate the distinction
> between concreteness and particularization, its standing analysis was
> incomplete.  It did not address the question framed by our discussion,
> namely, whether the particular procedural violations alleged in this case
> entail a degree of risk sufficient to meet the concreteness requirement.

136 S.Ct. at 1548–1550 (citations and some internal quotation marks omitted).

I have quoted and parsed at some length the Supreme Court's opinion in *Spokeo.*  For the more

humble pilgrim or wayfarer, the opinion may have certain Delphic qualities.  But the opinion constitutes the

Court's most recent utterances on a core question in the cases at bar.  A trial judge's duty is to discern and

then follow the Supreme Court's meaning.

C.

Allco's theory of injury-in-fact begins with the federal statutory scheme.  The Second Circuit noted

in *Allco II* that the FPA gives FERC "exclusive authority to regulate sales of electricity at wholesale in

interstate commerce," and "States may not act in this area unless Congress creates an exception."  805 F.3d

21

at 91.  "PURPA contains one such exception that permits states to foster electric generation by certain power production facilities ('qualifying facilities') that *have no more than 80 megawatts of capacity* and use renewable generation technology." *Id.* (*citing* 16 U.S.C. § 824a-3) (*emphasis added*).  "A state may regulate wholesale sales by qualifying facilities . . ." *Id.*  These provisions are central to the case at bar because the Allco electricity producers involved are of sufficiently modest capacity to be "qualifying facilities" for PURPA purposes.

The gravamen of Allco's complaint, expressed by counsel at the April 27 hearing, is that in furtherance of the 2015 RFP, the Defendants "are about to engage in compelling wholesale electricity contracts . . . with non-qualifying facilities." Oral Argument Tr. 3–4.  Allco contends that the State Defendants "are not allowed to do that under federal law" because "to have an RFP like the one they're having, they're only allowed to have qualifying facilities be the bidders," Oral Argument Tr. 3; "The state has no power to regulate wholesale sales of electricity except with qualifying facilities." Oral Argument Tr. 10–11.

In those circumstances, Allco's counsel argued at the hearing, "we have standing in connection with our status as a qualifying bidder, not as a bidder or disappointed bidder." Oral Argument Tr. 4.  On the question of injury-in-fact, this colloquy ensued:

> THE COURT: Usually also to engage the subject matter jurisdiction of a court a plaintiff must show that he, she or it has suffered some form of injury which the law recognizes.  Here's the 2015 RFP, that round, and Allco has not sought to participate in that.  What is the injury that Allco complains of in the context of this particular case sufficient to satisfy that requirement, if it be one?
>
> MR. MELONE: So the first part of that answer is that for the qualifying facilities that were banned from participating, if the State is enjoined and prohibited from going through with the RFP, then – and is then required to do a compliant RFP which allows all qualifying facilities, and only qualifying facilities, to participate, then we have a path to redress our *injury of, one, not being able to participate, and, two, not being able to get a contract or even bid for a contract.*

22

Oral Argument Tr. 7–8 (*emphasis added*).

The several concepts of "injury" referred to in counsel's emphasized response overlap to some degree. It necessarily follows that an Allco electricity producer which is *not able to participate* in an RFP procurement process will not be able to bid for or get a contract awarded as the result of that process. In addition, an RFP-participating Allco facility has its contractual prospects reduced if Defendants allow participation by a producer "too large to be a qualifying facility under PURPA, so its selection prevented the selection of at least one of Allco's projects." *Allco II*, 805 F.3d at 92.

There seems to be no dispute that the State Defendants behaved in the manners of which Allco complains. Paragraph 36 of the complaint in *Allco III* and ¶37 of the complaint in *Allco IV*, read together, allege that for the 2015 RFP, participation is restricted to a minimum facility size of twenty megawatts, which excludes a number of QFs, including Allco projects in Connecticut, Vermont and Massachusetts that are under twenty megawatts in size. Defendants do not deny these allegations. As for the State soliciting bids from larger, non-PURPA qualifying facilities, Defendants do not deny having done so: on the contrary, they proclaim that they did.[7]

Allco's prayer for relief in the *Allco III* demands, *inter alia*, that Defendants be barred from issuing the 2015 RFP in its current form; non-QFs be barred from participating in the RFP; and any agreements that may have been executed by Connecticut utilities pursuant to the RFP be voided *ab initio*. Mr. Melone's quoted response at the argument captures the essence of Allco's claimed injury-in-fact. The fundamental injury to Allco, in Melone's words, is "not being able to get a contract," a deprivation prefaced by not being

---

[7] The Defendants' theory is that the procurement procedure implemented in the 2013 RFP and contemplated for the 2015 RFP is conducted pursuant to state law, in a fashion authorized by federal law, and that PURPA has nothing to do with the case. The PURA Defendants argue in a brief in *Allco III* [Doc. 46] at 8: "Connecticut is acting under express rights reserved to the states under the FPA; PURPA does not apply to the 2015 RFP, and no law requires Connecticut to conduct procurements under PURPA." This is a merits issue, which the Court neither considers nor decides in an analysis of Allco's standing to sue.

able to "even bid for a contract."  The question is whether injury of this nature constitutes "injury-in-fact" of the nature necessary to create standing.

Counsel for the Commissioner represented at the hearing that the State regulatory authorities have been engaged on the 2015 RFP procurement process for "two years," and "there are fifty bidders who have already bid in."  Oral Argument Tr. 29.  Counsel continued:

> This RFP, in order to get the best and cheapest bids, the RFP was done in conjunction with the efforts of Massachusetts and Rhode Island.  We are eighty-one percent of New England's load.  We asked for the best bids to meet this much larger load in hopes of getting lower prices for consumers. That was a deliberate – it's been two years, six governors that have been involved in this, fifty private bidders, all sorts of bid fees, and the bid fees are only held firm under the RFP for a short – certain period of time. . . . So this is why the states can't really just stop right now.  Any injunction against the State of Connecticut will halt the Massachusetts projects and Rhode Island projects because they assume that all three parties are working together.  That's how much we get the bids low.

Oral Argument Tr. 30.

To the extent that this submission by Defendants' counsel was intended to demonstrate a balance of hardships, it goes to a merits issue implicated by Allco's motion for a preliminary injunction and is not relevant to this standings analysis, with which merits issues have nothing to do.  "Our threshold inquiry into standing in no way depends on the merits of the plaintiff's claim." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (*citation and internal quotation marks omitted*). However, I consider this account on the issue of Allco's injury-in-fact *vel non* because it describes the competitive world in which Allco contends it was wrongfully denied to right to participate.

*Spokeo* teaches that in order to satisfy standing, an injury-in-fact must be "actual or imminent, not conjectural or hypothetical." 136 S.Ct. at 1548 (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In the case at bar, Allco alleges two separate but related injuries in connection with the 2015 RFP: its inability to bid for a contract with a utility company; and its consequent inability to get such a contract.

In the parlance of the race track, horse racing parlance, and thinking of Allco's smaller projects as race horses, Allco complains that its horses were kept out of the starting gate, and then prevented from winning the race. In standing to sue parlance, the first alleged injury is "actual or imminent"; indeed, it is actual, since at the beginning of the 2015 RFP procurement process the Defendants' conduct barred the smaller Allco projects from participating in it. The second injury – "not being able to get a contract" – can only be characterized as "conjectural or hypothetical." This asserted injury assumes, without any supporting evidence in the record, that if a barred Allco project had been allowed to participate in a sizable field of energetic industry competitors, the Defendants would have awarded Allco with one of the few contracts resulting from the process: an undistilled exercise in conjecture and speculation.

The Second Circuit sounded that note in *Allco II*, when it held that Allco lacked standing to challenge the Defendants' identical implementation of the 2013 RFP:

> Allco lacks standing because that requested relief does not redress its injury, *i.e.*, its not being selected for a Section 6 contract. Allco contends that its preemption claim should be permitted because it can redress its injuries simply by invalidating the commissioner's prior selections and voiding the contracts given to Fusion Solar and Number Nine. But those forms of relief, standing alone, fail to redress Allco's injuries, as they do not make it "likely, as opposed to merely speculative," that Allco will eventually receive a Section 6 contract.

805 F.3d at 98 (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Reverting to the 2015 RFP, Allco alleges that the Defendants' conduct of the 2015 procurement process injured Allco in fact because its "qualifying facilities," as defined by PURPA, were not allowed to participate in the 2015 RFP by virtue of their small size. The RFP, as structured by the DEEP Commissioner, was only for qualifying facilities with a minimum size of twenty megawatts, and twenty-six of Allco's

facilities are too small.[8]

Defendants counter that, because Plaintiff did not participate in the 2015 RFP, it could not be injured by it. Doc. 45, p. 5, Doc. 46, p. 6. Furthermore, Defendants argue that even if some of Allco's properties were not large enough to participate in the 2015 RFP, there was a separate RFP addressed to smaller facilities in which those owned by Allco could have participated. Doc. 45, p. 5–6. Allco responds that the RFP for smaller facilities would provide only "a small fraction of what would be available to Allco's QFs if the 2015 RFP complied with federal law." Doc. 47, p. 6, n. 9.

I accept that although Allco did not bid into the 2015 RFP, it has demonstrated that it has suffered a limited and discrete form of injury. That injury results from Defendants' conduct in barring certain Allco projects – although not all of them – from participating in the procurement process. The present issue is whether that particular injury is sufficient to satisfy the injury-in-fact element in evaluating Allco's standing to sue on the claims asserted and for the relief demanded in these actions. That further standing analysis appears *infra*.

Allco asserts an additional sort of injury-in-fact. Its contention, raised briefly at during oral argument, is that the 2015 RFP has had an effect on the avoided costs of Connecticut utilities that is adverse to Qfs. Oral Argument Tr. 8. Allco alleges in its complaint in *Alco III*:

> Plaintiff will suffer injury-in-fact because there is an increased risk that the Connecticut Utilities long-term forecasted avoided costs will decrease by the selection of non-Qualifying Facilities, thus reducing the revenue that Plaintiff's Qualifying Facilities would receive under the utilities' must buy obligation under Section 210 of PURPA.

Doc. 1, ¶ 52. Plaintiff further alleges in its complaint:

> Section 210(a) of PURPA provides all Qualifying Facilities with a guaranteed federal right

---

[8] Even though the Court accepts for standing purposes that the Plaintiff is attempting to enforce PURPA, the Court need not decide that Plaintiff is correct that the bilateral contracts at issue in this case cannot be pursued unless with QFs. *See, e.g., Denney*, 443 F.3d at 264 (2d Cir. 2006) ("[A]n injury-in-fact need not be capable of sustaining a valid cause of action.")

26

> to sell a QF's energy and capacity to electric utilities at that utilities long-term forecasted avoided costs.6 Section 210(f) of PURPA requires States to implement that guaranteed federal right. Here, by compelling wholesale transactions with non-Qualifying Facilities, the calculation of those long-term avoided costs will be adversely affected injuring Allco's Qualifying Facilities' right to sell at the rate that would have applied but for the Defendants' unlawful actions.

Doc. 1, ¶ 78. As the Second Circuit explained, "[a] state may regulate wholesale sales by qualifying facilities, but those facilities must generally receive a price for their electricity equal to the buying utility's 'avoided costs'— that is, those costs that the utility would have otherwise incurred in procuring the same quantity of energy from another source." *Allco II*, 805 F.3d at 92 (*citing* 18 C.F.R. § 292.304(b)(2); 16 U.S.C. § 824a–3(b)).

In the case at bar, Defendants contend "[t]he utilities have no cost structure for owned electric generation, because they are no longer required to serve customers with a portfolio of owned generation." Doc. 46, p. 7. Defendants assert that avoided costs are no longer calculated "based upon a number of contracts." Oral Argument Tr. 41. Defendants note instead that the current "cost measure is the wholesale price at the independent system operator of New England." *Id.* at p. 42.

This particular issue has not been briefed. I decline to hold whether or not this theory gives rise an injury-in-fact to Allco sufficient to satisfy the Article III standing requirement. I note, without deciding, that this is a problematic proposition. Even assuming that avoided costs are affected by Section 6 or Section 7 contracts, the injury would not appear to be either "concrete" nor "imminent," characteristics requited by *Spokeo* and the other cited cases to constitute an "injury-in-fact" under the rigorous standing doctrine imposed by Article III.

## D.

The other two elements of Article III standing, traceability and redressability, must also be considered. Allco must satisfy both of these elements, as well as that of injury-in-fact.

Traceability is clearly satisfied and requires no lengthy discussion. The element requires that a

plaintiff's injury-in-fact "is fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S.Ct. at 1547. Whatever injuries in fact Allco suffered as a result of the structure and implementation of the 2015 RFP are directly and solely traceable to one or another of the Defendants, who directed that structure and implementation.

Plaintiff does not fare as well with the element of redressability. In the closely similar circumstances of *Allco II*, the Second Circuit said: "To establish Article III standing, Allco must demonstrate: . . . (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." 805 F.3d at 93. "It must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted).

In *Allco II*, where Allco challenged the procurement process attendant upon the 2013 RFP, the Second Circuit noted that "Allco asserts as its primary injury its not being selected for a Section 6 contract." 805 F.3d at 93. Allco had entered the 2013 RFP bidding, without success. Its complaint included the request for order "enjoining the Commissioner from conducting future procurements that violate the Federal Power Act or PURPA." *Id*. at 95. The district court rejected that request. The Second Circuit held that "we affirm the district court's dismissal of Allco's claims seeking equitable relief regarding future procurements conducted by the Commissioner. For such relief to redress Allco's injury, 'it must be likely, as well as merely speculative', that Allco receive the Section 6 contract that it seeks." *Id*. at 96 (citing and quoting *Friends of the Earth*, 528 U.S. at 181)). That holding resonates in the case at bar, where Allco has not entered the 2015 RFP bidding and the relief it seeks centers upon future procurements. To the extent Allco seeks by the present action to void any contracts that may have been entered into under the 2015 process as of the date of this Ruling, Allco runs into the obstacle created by the Second Circuit in *Allco II* with respect to the 2013 process:

> But invalidating the Section 6 contracts awarded to Fusion Solar and Number Nine would simply deny Allco's competitors a contractual benefit without redressing Allco's injury – its

not being selected for a Section 6 contract. Because merely voiding its competitors' contracts would not redress Allco's injury, Allco also lacks standing to seek such equitable relief.

805 F.3d at 98.

Allco argues on these motions that "if the State is enjoined and prohibited from going through with the RFP, and is required to issue a compliant RFP which allows all qualifying facilities, and only qualifying facilities, to participate, Allco's injuries would be redressed. Allco's theory is that if this Court enjoins Defendants from completing the 2015 RFP procurement process, the State would then "be required to" do "a compliant RFP" and Allco would "have a path to redress our injury." Oral Argument Tr. 51.

The "injury" at the end of the curative path Allco seeks to travel is its being deprived of a State-directed contract between Allco and a Connecticut utility under the Section 6 statutory scheme. That claimed injury is the *raison d'etre* of all this litigation. Allco's theory of recovery depends upon two layers of conjecture and speculation. First, Allco conjectures that the DEEP Commissioner will issue a new and different RFP, fully compliant with PURPA, which would allow all Qualifying Facilities (large and small) to bid for contracts. Second. Allco conjectures that, having joined what appears to be a large field of electric energy competitors, Allco will win the competition, be selected and anointed by the Commissioner, and awarded a contract or contracts with a utility. That is the prize upon which Allco fastens its gaze. These gravamen of these actions is that the Defendants have wrongfully placed that prize beyond Allco's grasp.

The standing to sue problems are manifest. Allco seems to expect – certainly it hopes – that the Court will strike down the 2015 RFP issued by the Commissioner in such a manner that the ruling will force the State agency to "do a compliant RFP," a phrase Mr. Melone used during the argument, by which he means "compliant with PURPA."[9] This concept raises federalism concerns. There is nothing in the

---

[9] In *Allco II*, the Second Circuit analyzed Allco's comparable challenge to the 2013 RFP: "But under Allco's theory, the only way in which it may obtain a Section 6 contract is for the Commissioner to conduct *a PURPA-compliant bidding process* ." 805 F.3d at 94.

Connecticut statute that would compel Defendants to issue a new RFP if this Court invalidates the present one.  The authority of this federal court to direct Connecticut agencies to promulgate a revised electricity industry request for proposals, in place of the present 2015 RFP, is not readily discernible; and if that authority does not exist, Allco's injury is not redressable by the Court.

Quite apart from that element, the conjectural and speculative links in the chain connecting the Defendants' challenged conduct to the principal injury Allco alleges it suffered bring me to the conclusion that, in the totality of circumstances, it cannot be said that the injury is (as it must be) "actual and imminent, not conjectural or hypothetical." *Spokeo*, 136 S.Ct. at 1548.[10]

For the foregoing reasons, standing to sue analysis in the cases at bar presents significant questions with respect to the elements of injury-in-fact and redressability. Allco, "as the party invoking federal jurisdiction, bears the burden of establishing these elements," and "must clearly allege facts demonstrating each element." *Id.* at 1547. The Court concludes that Allco fails to carry that burden on both elements. A failure on either one would be sufficient for decision. Allco lacks standing to assert the claims and request the relief in question. That will require dismissal of Count one in the complaints in *Allco III* and *Allco IV*.

This analysis of Allco's jurisdictionally mandated standing is not altered by Congress's inclusion in the PURPA statute of a provision which authorizes the bringing of the action.  In *Allco II* the Second Circuit said that "PURPA provides a private right of action to 'qualifying cogenerator[s]' to enforce a state's obligations under PURPA," citing 16 U.S.C. § 824a-3(h)(2)(B).  805 F.3d at 92.  The court of appeals noted Allco's concession in *Allco II* (which related to the 2013 RFP) that "it does not rely on the private right of

---

[10]  The Second Circuit struck the same note in *Allco II*, 805 F.3d at 94 n. 3, when it dismissed in a footnote certain other claims Allco made in challenging the 2013 RFP procurement procedure: "The PURPA sales that Allco fears it would make at a lower price clearly did not occur at the time that the complaint was filed, as they are future sales.  There is also no indication in the record that these future sales were imminent when the complaint was filed.  As such, this alternative theory of injury is far too speculative to serve as the basis for an Article III injury-in-fact."

action" under that statutory provision, but went on to describe its structure anyway. A "qualifying cogenerator" such as Allco may petition FERC to enforce a state's requirements to comply with PURPA. Allco did so. If FERC declines to act (as it has done in the case at bar), § 824a-3(h)(2)(B) provides that "the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority . . . to comply with such requirements." The district court may then "issue such injunctive relief or other relief as may be appropriate." *Id*.

In the cases at bar, which involve the 2015 RFP, it is not clear if Allco also concedes that it does not rely on this statutory "private right of action." But it makes no difference, because a right to sue created by Congress in a statute does not and cannot create the standing to sue required by Article III of the Constitution. The Supreme Court emphasized that distinction in *Spokeo*:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even on the context of a statutory violation.

136 S.Ct. at 1549. In the cases at bar, Article III's standing requirements are not met. Allco's claims and requests for relief with respect to the 2015 RFP are too conjectural to be concrete, and the principal injury complained of is not redressable by the Court.

E.

Plaintiff makes an additional argument that Congress has conferred upon Allco "statutory standing to challenge State action that goes beyond the limits set by the FPA and PURPA." However, the case law cited to by Allco discusses only statutorily created injury, which is only one third of the standing analysis. *See Clinton v. City of New York*, 524 U.S. 417, 433 n. 22 (1998) (*citing Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666) ("denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result."). The Court agrees

31

that an injury may be created solely because a statute created a legal right, "the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3 (1973).  However, this argument only helps Allco if the resulting injury created by statute can be redressed by this Court. Plaintiff asserts that "any procurement that attempts to go beyond the limits set by Congress harms the very market participants that Congress created and intended to benefit." Doc. 47, p. 7. This merely reemphasizes Plaintiff's claimed actual injury: exclusion from the bidding process. Even with this argument, Allco does not overcome the standing problems discussed *supra*.

F.

Plaintiff also briefly argues that it also has standing under Section 210(h)(2)(B) of PURPA as a "private attorney general" because Congress authorized FERC to bring an action to enforce Section 210(f) of PURPA, and if FERC declines to do so, a QF "has been designated to bring such suit." Doc. 47, p. 7. Plaintiff cites to *Associated Industries of New York v. Ickes*, 134 F.2d 694 (2d Cir. 1943), for the proposition that Congress can authorize a person or a class of persons to bring suit to prevent an official from violating his statutory powers:

> While Congress can constitutionally authorize no one, in the absence of an actual justiciable controversy, to bring a suit for the judicial determination either of the constitutionality of a statute or the scope of powers conferred by a statute upon government officers, it can constitutionally authorize one of its own officials, such as the Attorney General, to bring a proceeding to prevent another official from acting in violation of his statutory powers; for then an actual controversy exists, and the Attorney General can properly be vested with authority, in such a controversy, to vindicate the interest of the public or the government. Instead of designating the Attorney General, or some other public officer, to bring such proceedings, Congress can constitutionally enact a statute conferring on any nonofficial person, or on a designated group of non-official persons, authority to bring a suit to prevent action by an officer in violation of his statutory powers; for then, in like manner, there is an actual controversy, and there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest. Such persons, so authorized, are, so to speak, private Attorney Generals.

*Associated Indus. of New York v. Ickes*, 134 F.2d 694, 704 (2d Cir. 1943). Plaintiff claims, by virtue of §

32

210(h)(2)(B), that standing is conferred upon it by Congress. The statute states in relevant part:

> Any . . . qualifying small power producer may petition the Commission to enforce the requirements of subsection (f) of this section . . . . If the Commission does not initiate an enforcement action . . . against a State regulatory authority or nonregulated electric utility within 60 days . . . , the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority . . . to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate.

16 U.S.C. § 824a-3(h)(2)(B). Section 210(f) "requires states to 'implement' FERC's rules promulgated under [Section 210(a)] by 'issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules.'" *Allco II*, 805 F.3d at 96 (*quoting FERC v. Mississippi*, 456 U.S. 742, 751 (1982)). As the Second Circuit noted in *Allco II*, "Allco's attempt to enforce PURPA's requirements stems not from a challenge to a state regulation promulgated under [§ 210(f)] but from a challenge to a state procurement law—Section 6." *Id.* at 97. While Allco is attempting to enforce PURPA requirements under § 210(a) in a roundabout fashion, the fact that Allco is subject to the exhaustion requirements of § 210(h)(2)(B) does not change the fact that this suit is about preemption and the Supremacy Clause. Thus, this statute does not confer standing on Allco as a private attorney general because Allco is not seeking to enforce PURPA, but rather is arguing that if the state does an RFP, it must comply with PURPA, lest it be preempted.

### G.

For the reasons stated, the Court concludes that Allco lacks standing to assert the claims and seek the relief discussed *supra* as it relates to the 2015 RFP.

Count One of the complaint in *Allco III* and Count One of the complaint in *Allco IV* are dismissed on the basis of Allco's lack of standing to sue. In that circumstance, the Court does not reach, and intimates no views upon, the merits of Plaintiffs' underlying claims or Defendants' defenses to them.

### VII.

Additional questions arise with respect to Allco's alternative claim, that Defendants violated the

dormant Commerce Clause of the United States Constitution.

Count Two of the complaint in *Allco III* [docket number 3:15-cv-608] asserts that the Defendants violated the dormant commerce clause because Connecticut's renewable portfolio standard ("RPS") statute discriminates against certain out of state businesses. Complaint ¶¶ 22, 64–65. The RPS statute requires utilities that sell to Connecticut consumers to include an increasing percentage of renewable energy in their portfolios in order to encourage the generation of renewable energy. Conn. Gen. Stat. § 16-245a(a). Utilities manifest their compliance with the statute by obtaining a renewable energy certificate ("REC") in one of three ways. First, a utility may purchase clean energy and the associated REC from a generator, which receives an REC for each megawatt of clean energy generated. Second, a utility may buy RECs on the open market. Third, a utility may own a renewable energy generator. RECs are tracked through the New England Power Pool ("NEPOOL"), a voluntary association that governs the issuance, transfer, and retirement of RECs.

In Connecticut, RECs only satisfy the RPS requirements if they are generated within the ISO-NE region or if they are generated in an adjacent region, including New York, Northern Maine, Quebec, and New Brunswick, but are transmitted to the regional grid. Conn. Gen. Stat. § 16-245a(b); NEEPOL General Information System ("GIS") Operating Rule 2.7(c). In fact, ninety percent of REC supply in Connecticut comes from other states. See, e.g., February 11, 2015 Decision in PURA Docket No. 13-06-11, Annual Review of Connecticut Electric Suppliers' and Electric Distribution Companies' Compliance with Connecticut's Renewable Energy Portfolio Standards in the Year 2012, p. 11. Connecticut notes that its "support and commitment to the NEPOOL-GIS is contingent on the fundamental design principle that each certificate represents a complete and comprehensive picture of the environmental, social and economic impacts of one particular generation unit." Responses of New England Power Pool and ISO-NE, [PURA] Review of RPS Standards and Trading Programs, Docket No. 04-01-13 (Jul. 12, 2004), *available at*

http://www.ct.gov/pura/docketsearch. Defendants also state that the goal of the RPS program is to "displace fossil generation in New England with renewable generation." *Id.* Allco generates RECs in Georgia through one of its solar facilities, but these RECs do not satisfy the RPS requirements in Connecticut. Complaint, ¶¶ 33, 68.

A.

Defendants argue that the Plaintiff lacks standing with respect to its dormant Commerce Clause claim because the claim is not redressable. As discussed *supra*, a plaintiff must also show that its injury is redressable by a decision of this Court for the Plaintiff to have standing. "It must be 'likely' as opposed to merely speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561. Defendants argue that Plaintiff, if successful on his dormant Commerce Clause claim, would invalidate the whole statute, which would do "nothing to aid plaintiff" because "[t]his Court cannot insert plaintiff's desired REC system" into the statute and it "cannot determine that plaintiff's REC system or RECs are legitimate or consistent with Connecticut's RPS." Doc. 13, p. 17

Plaintiff, on the other hand, argues that Defendant's standing argument misreads the statute. In its view, Allco would qualify as a "Class I renewable energy source," and thus the only limitation on its RECs is the language in the statute related to the geographical requirements. Plaintiff asks only for the court to invalidate the "offensive limiting parts in Conn. Gen. Stat. § 16-245a(b)(1)". In making that request, Plaintiff regards these "offensive parts" as severable.

While the severability of statutory provisions depends greatly on the legislative intent of the enacting body, the court must employ a presumption in favor of severability. *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984)."'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley v. Valeo*, 424 U.S. 1, 107 (1976) (*quoting Champlin Refining Co. v. Corporation Comm'n*

35

*of Oklahoma*, 286 U.S. 210, 234 (1932)).

Subsection B of Connecticut General Statute § 16-245a provides:

An electric supplier or electric distribution company may satisfy the requirements of this section (1) by purchasing certificates issued by the New England Power Pool Generation Information System, provided the certificates are for (A) energy produced by a generating unit using Class I or Class II renewable energy sources and the generating unit is located in the jurisdiction of the regional independent system operator, or (B) energy imported into the control area of the regional independent system operator pursuant to New England Power Pool Generation Information System Rule 2.7(c), as in effect on January 1, 2006; (2) for those renewable energy certificates under contract to serve end-use customers in the state on or before October 1, 2006, by participating in a renewable energy trading program within said jurisdictions as approved by the Public Utilities Regulatory Authority; or (3) by purchasing eligible renewable electricity and associated attributes from residential customers who are net producers.

Conn. Gen. Stat. § 16-245a(b). The language Plaintiff complains about specifically is the part of Subsection (b)(1)(A) which states "and the generating unit is located in the jurisdiction of the regional independent system operator. . . ."  Removing this language would still leave a fully operative law. The remaining question is: would the elimination of this language eviscerate the legislative intent of the law? This question must wait for another day, as all that is required to meet the redressability benchmark is that it must be likely that the injury will be redressed by a favorable decision. If the Court were to go the route that Plaintiff proposes, its RECs would be recognized by the state of Connecticut, and his injury would be redressed. That is sufficient to defeat Defendant's standing argument.

## B.

Plaintiff additionally argues that the restriction of the REC credits violates the dormant Commerce Clause. The Commerce Clause states that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. 1 , § 8, cl. 3. "[T]he Supreme Court has adhered strictly to the principle 'that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it.'" *Selvan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) (*quoting Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807 (1976)). Implied from the Commerce Clause

is the concept that the Commerce Clause "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *General Motor Corp. v. Tracy*, 519 U.S. 278, 287 (1997). "The fundamental objective of the dormant Commerce Clause is to 'preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.'" *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 208 (2d Cir. 2003) (*quoting Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997)).

However, not every regulation that affects interstate commerce is sufficiently offensive to the Commerce Clause to run afoul of it. "[T]here is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Selvan*, 584 F.3d at 90 (*quoting Kassel v. Consol. Freightways Corp of Del.*, 450 U.S. 662, 669 (1981)). Instead, a state statute violates the dormant Commerce Clause only if it (1) "clearly discriminates against interstate commerce in favor of intrastate commerce," *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004) (*citing, inter alia, Wyoming v. Oklahoma*, 502 U.S. 437, 454–55 (1992) ; *Healy v. The Beer Inst.*, 491 U.S. 324, 336 (1989); *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)); or  (2) is "directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007) (*citing Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). A statute that clearly discriminates against interstate commerce in favor of intrastate commerce is "virtually invalid *per se*." *United Haulers* , 550 U.S. at 331 (*citing Philadelphia v. New Jersey*, 437 U.S. at 624).  It can "survive only if the discrimination is 'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Id.* However, a statute that just incidentally burdens interstate commerce is still valid under the test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.*

37

First, the Court must determine, as a threshold manner, "whether a state or local government is 'regulating.'" *United Haulers*, 261 F.3d at 254 (*quoting C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389 (1994)). "'[A] state regulates when it exercises governmental powers that are unavailable to private parties,' such as the imposition of civil or criminal penalties to compel behavior." *Brown*, 320 F.3d at 208 (*citing United Haulers*, 261 F.3d at 255). Furthermore, "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976).

Plaintiff's Complaint alleges firstly that the RPS statute "facially discriminates against out-of-state business" and, secondly, should the court disagree that the statute facially discriminates against out-of-state business, that the statute "has the purpose or effect of discriminating against out-of-state businesses." Complaint, p. 15 ¶ 63.  Plaintiff asserts that "Connecticut's prohibition is not closely tailored to achieve any legitimate local purpose. Nor does the prohibition provide for putative local benefits to Connecticut that outweigh the burdens on interstate commerce." *Id.* at ¶ 64.

DEEP Defendants argue that the RPS statute does not violate the Commerce Clause because it does not mention in-state energy resources at all, and thus does not discriminate in favor of in-state interests. Defendants further argue that the RPS only incidentally burdens interstate commerce, and is the only means to address the environmental issues facing Connecticut, including the fact that it has not met the national ambient air quality standards ("NAAQS") for nitrogen oxide and particulate matter emissions pursuant to the Clean Air Act. The goal of the RPS statute is to displace fossil fuel energy, of which nitrogen oxide and particulate matter emissions are a by-product, and replace it with "clean energy." Defendants assert that clean energy produced in Georgia does nothing to offset the fossil fuel energy in Connecticut. PURA Defendants additionally argue that the Class I RECs are a state-created subsidy, and thus do not trigger the dormant

38

Commerce Clause. Furthermore, PURA Defendants argue that the subsidy does not reflect an in-state preference.

Not every "action by a State that has the effect of reducing in some manner the flow of goods in interstate commerce is potentially an impermissible burden." *Alexandria Scrap*, 426 U.S. at 805. The RPS statute does not present the typical dormant commerce clause issue. Rather, it is distinguishable from the foundational dormant Commerce Clause cases, which found that various state laws imposed a burden on interstate commerce. *See, e.g., West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) (Massachusetts pricing order subjects all milk sold by dealers to Massachusetts retailers to an assessment that is distributed only to Massachusetts farmers)*; Hughes v. Oklahoma,* 441 U.S. 322 (1979) (Oklahoma prohibition on transporting or shipping minnows procured in Oklahoma out of state)*; Pike*, 397 U.S. at 145 (Arizona requirement that fresh fruit grown in state be packaged instate prior to interstate shipment); *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525 (1949) (license denial for out of state milk distributor with plans to process raw milk from New York for shipment to Boston); *Toomer v. Witsell*, 334 U.S. 385 (1948) (South Carolina requirement that shrimp boats pack and pay taxes on catches before transporting the shrimp out of state); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) (Louisiana requirement that shrimp be shelled and beheaded before transporting them interstate). Unlike these cases involving state action limiting access to commerce with a wide national distribution, Connecticut created the commerce in RECs. There is not an interstate market for RECs that comply with Connecticut requirements. Though other states use RECs created by NEPOOL, and as Plaintiff notes, there are other less geographically restrictive REC programs in Connecticut.

"[T]he Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace." *Reeves, Inc. v. State*, 447 U.S. 429, 436–37 (1980). In this case, there is no national marketplace for RECs. Each state that has created an REC or a similar program has its

own set of requirements. The RPS statute that Plaintiff complains of is a part of a plan by the state to subsidize the generation of renewable energy, and the resulting REC market is wholly a creation of the RPS statute. Whereas a shrimp in Louisiana is the same creature as a shrimp in Wyoming (with identical physical and emotional strengths and weaknesses, hopes and fears), an REC in Connecticut is not necessarily an REC in Colorado; instead, the market exists only within Connecticut.

The Supreme Court, in *Hughes v. Alexandria Scrap Corp.*, held that Maryland law offering a bounty for old automobile hulks that required more onerous paperwork from out-of-state hulk processors rather than in-state processors did not violate the dormant Commerce Clause. Instead, the Court noted:

> Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price. There has been an impact upon the interstate flow of hulks only because . . . Maryland effectively has made it more lucrative for unlicensed suppliers to dispose of their hulks in Maryland rather than take them outside the state.

*Alexandria Scrap*, 426 U.S. at 806. Here, like Maryland in *Alexandria Scrap*, Connecticut is making it more lucrative for generators to produce and distribute clean energy in Connecticut. Connecticut is not preventing the flow of clean energy or regulating the conditions on which it may occur. Instead, Connecticut, through its RPS statute, has created a secondary REC market that incentivizes the production and distribution of clean energy in and around Connecticut, where it will have a measurable impact on Connecticut's environmental goals.

Furthermore, "the competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis." *Reeves*, 447 U.S. at 439. In *Reeves, Inc. v. Stake*, South Dakota created a cement plant that for many years sold cement to neighboring states. However, during a shortage of cement, South Dakota confined the sale of cement produced at the state-owned facility to state residents. *Id.* The Supreme Court held that this did not violate the Commerce Clause because states are permitted to participate in a market and favor its own

40

citizens in doing so. *Id.* "Restraint in this area is also counseled by considerations of state sovereignty, the role of each State 'as guardian and trustee for its people,' and 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Reeves*, 447 U.S. at 438 (*quoting, inter alia, Heim v. McCall*, 239 U.S. 175, 191 (1915); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).   While Connecticut is not necessarily itself participating in the creation of RECs, the situation is analogous. Connecticut created a market for RECs, and is not obligated to spread the benefit of that market to states that do not also bear the burden of the cost of the subsidy, which is ultimately paid by Connecticut ratepayers. While Plaintiff alleges that this is protectionist, the RPS statute is "protectionist only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve." *Reeves*, 447 U.S. at 442.

Further to this point, Defendants argue that Connecticut has legitimate environmental goals to reduce its dependance on "dirty energy" sources, and has "non-attainment" status in relation to the nitrogen oxide and particle emission NAAQS. Connecticut is currently under an obligation under the Clean Air Act to develop a State Implementation Plan ("SIP") that demonstrates to the Environmental Protection Agency that the state has a plan to meet the NAAQS for nitrogen oxide and particle emissions. Defendants note that Connecticut's attainment status of the NAAQS is not served by Allco's generation of renewable energy in Georgia unless that energy displaces Connecticut's own use of non-renewable energy sources, and thus presumably would not help them meet their obligations under federal law. Extending the RECs to Georgia does nothing to help Connecticut reach attainment status, but still passes the cost of the REC onto the Connecticut consumer. *See, e.g. Alexandria Scrap*, 426 U.S. at 815–16 (Stevens, J. concurring) ("[The] failure to create commerce would have been unobjectionable because the Commerce Clause surely does not impose on the States any obligation to subsidize out-of-state business.").

Plaintiff cannot defeat this law by shoe-horning it into the confines of the dormant Commerce Clause. For the reasons stated above, the Court holds that the dormant Commerce Clause does not apply to Connecticut because the RPS creates a market for RECs, rather than impeding on a previously existing national market. Furthermore, Connecticut is not obligated to pass the benefits of its subsidy program without restriction to those producing clean energy in Georgia. Count Two of the complaint in *Allco III* [docket no. 315-cv-1508] is dismissed.

VIII.

Count Three of the complaint in *Allco III* [docket no. 315-cv-1508] alleges a violation of § 1983, namely that the actions of Defendants, in implementing the RFP and the RPS statutes, deprived Plaintiff of constitutional and federal rights under the color of state law. The Court having concluded that Plaintiff does not allege a viable claim under Counts One or Two, the Section 1983 claim in Count Three will be dismissed as well.

IX.

For the foregoing reasons, the complaint in each of these two captioned cases will be dismissed. It follows that in each case, the complaint having been dismissed, the Plaintiff's motion for preliminary injunctive relief will be denied as moot.

The Court makes the following Orders in these cases:

**Docket Number 3:15-608**  (*Allco Finance Limited v. Klee, et al.)*:

1.  Defendants' Motions to Dismiss [Doc. 12 and Doc.13] are GRANTED.

2.  Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. 37] is DENIED AS MOOT.

3.  The Clerk is directed to dismiss the complaint with prejudice and close the file.

**Docket Number 3:16-cv-508** (*Allco Finance Limited v. Klee, et al.*):

42

1.    Defendants' Motions to Dismiss [Doc. 20 and Doc. 21] are GRANTED.

2.    Plaintiff's Motion for an Order to Show Cause [Doc. 13] is DENIED AS MOOT.

3.    The Clerk is directed to dismiss the complaint with prejudice and close the file.

**All of the foregoing is SO ORDERED.**

Dated:   New Haven, Connecticut
         August 18, 2016


                                        _/s/ Charles S. Haight, Jr._____
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

43